MATOVINA ET AL. *v.* HULT.

[No. 18,518. Filed February 4, 1955.]

Samuel S. Dubin and Paul Piazza, of Gary, for appellants.

E. Miles Norton and John R. Lynch, of Crown Point, for appellee.

BOWEN, J.—This is an appeal from a judgment on a jury's verdict in a suit charging false imprisonment. Issues were joined on the appellee's amended complaint for damages against the appellants, who were police officers of the city of Gary, Indiana, and the answer of defendants thereto in denial and setting up the two year statute of limitations. The appellee filed a reply denying the allegations of appellants' answer and alleging further in such reply that the appellee was imprisoned without warrant from December 1, 1944, to an including December 6, 1944, on which last date a warrant was obtained while appellee was still in jail, and that appellee's complaint was filed on December 6, 1946, which was within the time provided by law.

The court, at the close of appellee's evidence in chief, sustained a motion for a directed verdict on a second paragraph of the complaint, which was for malicious prosecution, and which is not material in this appeal.

The cause was tried by a jury which returned a verdict against the appellants in the sum of $4,000.00. The appellants filed a motion for a new trial which was denied, and this appeal followed.

Grounds of the motion for a new trial were that

the verdict was not sustained by sufficient evidence and was contrary to law, and that the court erred in overruling appellants' motions for a directed verdict.

Appellants' major contention is that appellee's action was barred by the statute of limitations, which issue was raised by written motions for a directed verdict at the conclusion of appellee's evidence and at the conclusion of all the evidence, which motions were overruled by the court.

The record discloses that the appellee, Martin S. Hult, was a machinist working for the Western Electric Company in Cicero, Illinois. A dead person had been found upon a highway about two and one-half miles from downtown Gary, who obviously had been struck by a hit and run motorist. A few feet from the body a factory worker's identification badge was found. The badge was traced to the appellee who acknowledged ownership. He acknowledged having driven through Gary on the way to Michigan to his farm on the day the body was found. He was taking a door and other lumber attached to the top of his car and had to make occasional stops to tighten the lumber, and when he reached Battle Creek, Michigan, he discovered his factory identification badge missing. Two Gary police officers, appellants Stanton and Aldridge, came to the Western Electric Company in Cicero, where appellee worked, at about 10 minutes to 3:00 in the afternoon on December 1, 1944, in the company of Cicero police. Appellee was taken by such officers to the Cicero police station where he was told by the Cicero police that he was under arrest. The appellee got into the Gary police officers' car and proceeded to the Gary police station. He was finger-printed and photographed, and put in a cell block. He was not served any food after arriving in Gary. He was ques-

tioned after arriving at Gary and later questioned more. He was questioned again about 2:00 A.M. Saturday by appellants Stanton and Aldridge. They talked harshly to him and told him they could beat him up. The jail was unclean and cold and the steam pipes turned on intermittently. When a witness visited him in the Gary jail appellee was nervous and shivering and trembling from the cold. In the process of painting part of the jail, paint would fly over the appellee. Steam would blow out of the steam pipes when the heat was on, and on occasions when it was turned off, the jail was extremely cold and the windows were left open. He was served food twice a day and on occasion was served cabbage leaves floating on top of water. He was questioned continually on Sunday, and questioned night and day. The appellee was in good health when he was taken to the Gary jail and when he left he had developed a bad cold and was coughing badly. He was held in the Gary jail until December 5th when he was brought to the jail at Crown Point and turned over to the sheriff at 4:30 P.M. He was released from the Crown Point jail about noon on December 6, 1944.

The evidence most favorable to appellee showed that an affidavit was dictated by Lester Ottenheimer, a deputy prosecutor, on December 6, 1944, and from the record the lower court could have properly concluded that the appellee had been held and detained by the appellants and the sheriff of Lake County from December 1, 1944, to December 6, 1944, without any affidavit or warrant having been filed against him, and that on such date an affidavit was finally filed, a warrant issued, bond posted, and appellee released. The charges on which the affidavit were based were dropped some months later by the prosecutor.

During the time appellee was incarcerated, officers

Stanton and Aldridge went to Battle Creek, Michigan, and took an officer from the Battle Creek police station to the garage where the appellee's car was stored and made an examination of it. Following the visit of these officers to Battle Creek an article appeared in a Sunday newspaper which stated that two Gary, Indiana, policemen identified appellee's car as a hit and run car involved in the death of a person at Gary, identifying the appellee by name, and his farm location, and accusing him of the crime. After the publication of the newspaper story and following his release from the Gary jail, Mr. Hult applied for credit at the Montgomery Ward Company at Battle Creek, which application was not approved, and later went to the Better Business Men's Bureau in Battle Creek and found out that his credit was not good. At the Business Men's Bureau they brought out an envelope and pulled out a copy of the newspaper article and showed it to the appellee's wife.

The gist of the appellants' contention based on the statute of limitations is that since the suit was filed on December 6, 1946, that appellants' liability for any false imprisonment ended at 4:00 P.M. on December 5, 1944, when the appellee was delivered to the Lake County sheriff.

The jury answered appellee's interrogatory numbered 1, which was as follows: "Was plaintiff, Martin S. Hult, charged by affidavit with some offense and his bond fixed on December 5, 1944?" with the answer "No." This conclusion of the jury is supported by the testimony of Lester Ottenheimer, the deputy prosecutor.

The appellants admitted they had no warrant for the appellee's arrest or imprisonment when he was placed in the Gary city jail, and on December 1st, 2nd,

3rd, 4th, and 5th. They testified they were holding appellee while they were investigating the case.

The power of determining the length of time that a person may be detained upon reasonable or probable cause that a felony has been committed is not a matter within the discretion of the officer making the arrest. The law is well established in this state that a police officer under such circumstances cannot legally hold the person arrested in custody for a longer period of time than is reasonably necessary, under all of the circumstances of the case, to obtain a proper warrant or order for his further detention from a proper judicial tribunal authorized under the law to issue such order or warrant. As stated in *Harness* v. *Steele* (1902), 159 Ind. 286, 64 N. E. 875:

> "If the person arrested is detained or held by the officer for a longer period of time than is required under the circumstances, without such warrant or authority, he will have a cause of action for false imprisonment against the officer and all others by whom he has been unlawfully detained or held. (Citing cases)
>
> "An officer arresting without a warrant cannot justify his action in holding or detaining the prisoner for an unreasonable time before obtaining a warrant upon the ground that such delay was necessary in order to investigate the case and procure evidence against the accused."

The learned justices of the Supreme Court of the United States have in recent times had occasion to examine and study the background of the Indiana law with reference to its requirement for a prompt arraignment, in *Watts* v. *Indiana* (1949), 338 U. S. 49, 69 S. Ct. 1347. It is interesting to note the language used in this opinion as to the prompt arraignment require-

ment of the Indiana law. Justice Frankfurter, who wrote the majority opinion, stated in the course of such opinion, "Although the law of Indiana required that petitioner be given a prompt preliminary hearing before a magistrate, . . ." Justice Douglas, in his concurring opinion, stated, "He was not promptly arraigned as Indiana law requires"; and even Justice Jackson, disagreeing with the reasoning of Justices Frankfurter and Douglas, stated, "If the opinion of Mr. Justice Frankfurter in the Watts case were based solely on the State's admissions as to the treatment of Watts, I should not disagree."

While police officers may sometimes feel that the constitutional cloak thrown around the accused and the innocent seems to thwart them in their arduous duties in prosecuting criminals, and while the law should protect police officers in the proper discharge of their duties, still, as such police officers they must respect the law of this state, which requires a prompt arraignment of persons charged with crime. Indiana Constitution, Art. 1, §15; §9-1024, Burns' 1942 Replacement; *Harness* v. *Steele, supra; Bonahoon* v. *State* (1931), 203 Ind. 51, 178 N. E. 570; *Hall* v. *State ex rel. Freeman* (1944), 114 Ind. App. 328, 52 N. E. 2d 370; Ewbank's Criminal Law, 2d ed., §249, p. 152. See also 35 C. J. S., False Imprisonment, §31, p. 547. In spite of our Constitution and statutes, and the pronouncements of the courts of this state, and even the Supreme Court of the United States, in reviewing our own law, police officers in the instant case do not seem to have learned the limitations of their power to hold accused persons for investigation. The appellants held the appellee for investigation for five days while he was questioned day and night under what appears from the record to be very deplorable con-

ditions, without giving him the prompt arraignment within a reasonable time as required by the laws of this state.

The present suit was filed on December 6, 1946, and the appellants urge that once they had delivered the appellee to the sheriff of Lake County for further incarceration on December 5, 1944, at 4:30 P.M., his imprisonment became the sheriff's responsibility thereafter, and that the appellants were therefore no longer responsible for the unlawful imprisonment of appellee, and that the statute of limitations therefore had run prior to the filing of this suit by appellee.

Both counsel for appellants and appellee accept the established law that the statute of limitations did not begin to run until the termination of the imprisonment. 35 C. J. S., False Imprisonment, §49, p. 578; *Hackler* v. *Miller* (1907), 79 Nebr. 206, 112 N. W. 303. However, the appellants contend that the imprisonment terminated as far as appellants were concerned upon the delivery of the prisoner to the sheriff. The appellee, on the other hand, contends that the unlawful imprisonment did not terminate until his release from the custody of the sheriff at Crown Point jail at noon on December 6, 1944. Appellants' counsel suggests that a Michigan case decided in the United States Court of Appeals, *Alexander* v. *Thompson,* 195 Fed. 31 (C. C. A. 6th 1912), appears to be the only case where the facts approach the facts in the instant case, and such case is submitted as the sole authority upon which reversal of this case is requested. It becomes necessary, therefore, for us to examine the foregoing case in the light of the established law as to false imprisonment to pass upon appellants' assignment of error.

The law seems to be well established that, as a

general rule, all those who, by direct act or indirect procurement, personally participate in or proximately cause the unlawful restraint or detention are liable therefor as joint tort-feasors, jointly and severally, regardless of the degree or extent of the individual activity, and each is so liable although he did not know that the detention was illegal in its inception. . . . Where different parties participate at different times in unlawful detention, plaintiff is not obligated to divide the trespass into parts and sue each for a part since it is not necessary that all defendants should have been present at the commencement of the detention, all those afterwards joining in the unlawful detention becoming trespassers *ab initio*. 35 C. J. S., False Imprisonment, §37, pp. 550, 551, and footnote 88.

In the instant case the burden was upon the appellants to show the running of the statute of limitations by proving the termination of the unlawful imprisonment. It was a question for the trier of the facts to determine when the unlawful imprisonment terminated from all the evidence. In the case of *Alexander* v. *Thompson, supra,* the subsequent confinement of the plaintiff in the asylum was with the full consent of the plaintiff, and the subsequent restraint in such case was entirely lawful. In the instant case it can hardly be said by any stretch of the imagination that the act of the appellants in turning the appellee over to the sheriff of Lake County was an act of discharge or release, or termination of the false imprisonment. Should such a rule be adopted police officers could hold a defendant incommunicado indefinitely by the simple process of delivering him to successive places of confinement.

It seems apparent from the record before this court

that the appellee was unlawfully imprisoned from the first day of December, 1944, until he was released at noon on December 6, 1944, and the statute of limitations did not begin to run until December 6, 1944. The court below therefore did not err in overruling appellants' motion for a new trial based upon the ground that the statute of limitations had run.

A further question which we are called upon to decide is whether or not the damages assessed by the jury are excessive.

In order for us to set aside the jury's verdict in the instant case, on the ground of excessive damages, it must appear that the amount fixed by the jury is so large that it cannot be explained upon any reasonable hypothesis other than that prejudice, passion, partiality, corruption, or that some improper element was taken into account. *Oberlin* v. *Pyle* (1943), 114 Ind. App. 21, 49 N. E. 2d 970; *Efroymson* v. *Smith* (1902), 29 Ind. App. 451, 63 N. E. 328. The evidence of the imprisonment of the appellee and his subsequent confinement from December 1st to December 6th under the vile conditions heretofore set forth in this opinion, with lack of sufficient food and sleep, threats and accusations, with conditions which produced a bronchial disorder which was still present at the date of the trial, with loss of wages and the newspaper notoriety and publicity with reference to the charges in communities where the defendant lived, thereby affecting his credit, was sufficient to justify the jury in awarding damages of $4,000.00. A case somewhat similar in facts is to be found in *Missouri Pac. R. Co.* v. *Yancey* (1929), 180 Ark. 684, 22 S. W. 2d 408, in which the higher court upheld an award of damages in the amount of $3,000.00 as not being excessive.

We cannot say on the basis of the evidence before us

that the damages awarded in the instant case are such as to show that the jury was actuated by passion, prejudice, partiality, corruption, sympathy, or any improper motive. The amount of damages awarded by the jury was not excessive.

The verdict of the jury was sustained by sufficient evidence and was not contrary to law. Also, the court did not err in overruling appellants' motions for a directed verdict.

For the reasons given in this opinion we find no reversible error, and the judgment is hereby affirmed.

NOTE.—Reported in 123 N. E. 2d 893.